UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                             :
WILLIAM JOHN SENESCHAL     :        3:18-CV-00015 (RMS)
                             :
v.                               :
                             :
NANCY A. BERRYHILL,      :
ACTING COMMISSIONER OF  :
SOCIAL SECURITY[1]        :        DATE: MARCH 7, 2019
                             :
------------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

      This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA" or "the Commissioner"]

denying the plaintiff Social Security Disability Insurance ["SSDI"] benefits.[2]

I.     ADMINISTRATIVE PROCEEDINGS

      On or about April 12, 2012, the plaintiff filed an application for SSDI benefits claiming

that he has been disabled since March 1, 2011, due to "[a]rthri[tis], diverticulitis, [l]eg problems,

shoulder problems[, d]eaf in left ear, [f]atigue, [h]ernia, and [c]hronic [hepatitis] C [without]

mention of heptic coma."  (Certified Transcript of Administrative Proceedings, dated February 1,

2018 ["Tr."] 373–76; *see* Tr. 202, 263).  The Commissioner denied the plaintiff's application

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. § 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

[2] The plaintiff filed applications for both SSDI and Supplemental Security Income ["SSI"] benefits.  (*See* Tr. 352–57, 373–76).  On April 19, 2012, the Commissioner denied the plaintiff's application for SSI, reasoning that the plaintiff was "over-asset."  (Tr. 251–62).  The plaintiff does not appeal from the denial of his SSI application and, therefore, only the plaintiff's application for SSDI benefits is at issue in this case.  (*See* Doc. No. 29-1 at 1 n.1).

initially and upon reconsideration. (Tr. 224–32, 234–49). On March 22, 2013, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 281–82), and on June 26, 2014, a hearing was held before ALJ Martha Bower, at which the plaintiff and a vocational expert, Edmond J. Calandra, testified. (Tr. 199–223; *see* Tr. 315–335, 343–49). On August 5, 2014, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 179–98). On August 13, 2014, the plaintiff requested review of the hearing decision (Tr. 178), and on October 26, 2015, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 2–6).

The plaintiff appealed to the District Court from the ALJ's August 5, 2014 decision on December 21, 2015. *See Seneschal v. Colvin*, No. 3:15-CV-1845 (AVC), Doc. No. 1. In that case, the defendant filed a Motion for Entry of Judgment under Sentence Four of 42 U.S.C. § 405(g) with Reversal and Remand of the Cause to the Defendant. *Seneschal*, Doc. No. 18. In particular, the defendant stated, "Upon review of the record, the Commissioner finds that further development of the record and additional administrative action is warranted." *Seneschal*, Doc. No. 18 at 1. The defendant indicated that, on remand, "[t]he ALJ will reassess [the] plaintiff's maximum residual functional capacity, and in so doing, reevaluate the medical and other opinions of record. The ALJ will also, if appropriate, obtain vocational expert testimony to determine whether plaintiff can perform past relevant work and/or make an adjustment to other work that exists in significant numbers." *Seneschal*, Doc. No. 18 at 2.

On July 11, 2016, Senior United States District Judge Alfred V. Covello entered an order reversing the Commissioner's decision and remanding the case to the Commissioner for additional administrative proceedings. *See Seneschal*, Doc. No. 19. Judgment entered in the plaintiff's favor on July 14, 2016. *See Seneschal*, Doc. No. 20.

On August 20, 2016, the Appeals Council issued an order remanding the case to an ALJ. (Tr. 993–98). In the order, the Appeals Council specified that the ALJ should do the following: (1) further develop the record, including additional opinion evidence; (2) discuss whether it was "medically necessary" for the plaintiff to use a cane; and (3) address the plaintiff's overhead reaching limitations in his residual functional capacity. (Tr. 995–96). Accordingly, a second hearing before an ALJ took place on May 24, 2017, before ALJ John Noel. (*See* Tr. 831–47). At the hearing before ALJ Noel, the plaintiff, and vocational expert, Steven B. Sachs, PhD,[3] testified. On September 6, 2017, the ALJ issued another unfavorable decision denying the plaintiff's claim for benefits. (Tr. 828–47).

The plaintiff filed his complaint in this pending action on January 3, 2018. (Doc. No. 1). On January 22, 2018, the parties consented to jurisdiction by a United States Magistrate Judge, and the case was reassigned to Magistrate Judge Joan G. Margolis. (Doc. No. 16). On March 9, 2018, the defendant filed her answer and certified administrative transcript, dated February 1, 2018. (Doc. No. 17). The case was then transferred to this Magistrate Judge on May 1, 2018.

---

[3] At the hearing, the plaintiff's counsel objected to Mr. Sachs's qualifications to testify as a vocational expert. The plaintiff's counsel argued that

> Mr. Sachs is likely to testify that job incidence data come from a publication commercially available from the U.S. Publishing Company. He has no expertise, he has no ability to tell me as to the bases used by U.S. Publishing Company in the generation of their data. He is unqualified to give testimony with respect to job incidence data.

(Tr. 889). The plaintiff's counsel added that

> [w]ith respect to available jobs that are present Dr. Sachs is likely to testify as to the existence of certain jobs that he has testified to for an extended period of time in different cases and in different cont[exts]. This sort of testimony is not appropriate for a vocational witness . . . , and the witness is not qualified to give the testimony.

(Tr. 889–90). The ALJ overruled the objection, reasoning that, because the commercial publication's data is grounded in data from the Bureau of Labor Statistics, the data in the commercial publication is reliable. (Tr. 831–32). The ALJ added, "Dr. Sachs's resume indicates a long history of employment in the field of vocational rehabilitation" and, therefore, he "is well qualified to testify as an expert on the occupations available to individuals with various limitations and the number of jobs in such occupations in the national economy." (Tr. 832).

(Doc. No. 21). After three consent motions for extension of time, the plaintiff filed the pending Motion to Reverse the Decision of the Commissioner on July 2, 2018, with brief in support (Doc. No. 29 [Pl.'s Mem.]), and a stipulation of facts. (Doc. No. 29-1). On August 31, 2018, the defendant filed her Motion to Affirm the Decision of the Commissioner with brief in support. (Doc. No. 30 [Def.'s Mem.]).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 29) is DENIED, and the defendant's Motion to Affirm (Doc. No. 30) is GRANTED.

## II.    FACTUAL BACKGROUND[4]

The Court presumes parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the Joint Stipulation of Facts (Doc. No. 29-1). The Court cites only the portions of the record that are necessary to explain this ruling.

## III.    THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff's date last insured was September 30, 2016 (Tr. 834), and that the plaintiff had not engaged in substantial

---

[4] The Court adopts and incorporates by reference the parties' Joint Stipulation of Facts (Doc. No. 29-1). Throughout this Ruling, commonly used medical terms do not appear in quotation marks although the terms are taken directly from the plaintiff's medical records.

[5] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding regarding the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

gainful activity since the alleged onset date of March 1, 2011, through his date last insured. (Tr. 834, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that, as of the date last insured, the plaintiff had the following severe impairments: degenerative disc disease; arthritis of the upper and lower extremity; depression; and post-traumatic stress disorder.[6] (Tr. 834, citing 20 C.F.R. § 404.1520(c)). At step three, the ALJ concluded that, as of the date last insured, the plaintiff did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 836, citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). The ALJ found that, as of the date last insured, the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that he could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; frequently stoop; occasionally balance, kneel, crouch, and crawl; and could perform simple, routine tasks, use judgment limited to simple, work-related decisions, and deal with routine changes in the work setting. (Tr. 838). At step four, the ALJ concluded that, as of the date last insured, the plaintiff was unable to perform any past relevant work (Tr. 846, citing 20 C.F.R. § 404.1565); however, after considering the plaintiff's age, education, work experience, and RFC, he concluded, at step five, that jobs existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 846, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Specifically, the ALJ determined that the plaintiff could perform the jobs of a hand packer, a production worker, and a production inspector. (Tr. 847). Accordingly, the ALJ concluded that the plaintiff was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date of

---

[6] The ALJ found also that the plaintiff suffered from the following nonsevere impairments: hepatitis C; diverticulitis; deafness in his left ear; history of substance abuse; and obesity. In addition, the plaintiff alleged having a learning disability, though "there is no such diagnosis in any treating or examining notes." (Tr. 835). The ALJ, however, explained that he would "consider related symptoms in the context of [the plaintiff's] other severe impairments." (Tr. 835).

March 1, 2011, through the date last insured of September 30, 2016. (Tr. 847, citing 20 C.F.R. § 404.1520(g)).

IV.     STANDARD OF REVIEW

      The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). Second, the court must decide whether substantial evidence supports the determination. *See id.* The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation and internal quotations marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v.*

*Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff contends that the ALJ erred in several respects.  First, the plaintiff argues that the ALJ improperly relied upon the testimony of the vocational expert, Dr. Sachs, in reaching his decision at step five of the analysis.  (*See* Pl.'s Mem. at 1–21).  Second, the plaintiff argues that the ALJ failed to follow the treating physician rule.  (*See* Pl.'s Mem. at 21–28).  Third, the plaintiff argues that the ALJ failed to develop the record, as there was no medical source statement from any of the plaintiff's mental health treating physicians.  (*See* Pl.'s Mem. at 28–36).  Lastly, the plaintiff argues that the "ALJ's evaluation of the plaintiff's pain was insufficient."  (*See* Pl.'s Mem. at 36–37).  The Court disagrees with the plaintiff's claims.

A.    THE ALJ PROPERLY RELIED ON THE TESTIMONY OF THE VOCATIONAL EXPERT

The plaintiff argues that the ALJ relied improperly upon the testimony of the vocational expert, Dr. Sachs, in reaching his conclusion at step five.  (*See* Pl.'s Mem. at 1–21).  Specifically, the plaintiff argues that Dr. Sachs's use of data from the U.S. Publishing Company, which gets its data from the Bureau of Labor Statistics, is problematic for two reasons: (1) "the U.S. Publishing Company document only breaks down Bureau of Labor Statistics data by skill level and exertional level; it does not account for any of the other variables that might be included in an ALJ's hypothetical"; and (2) "Mr. Sachs has provided us with absolutely no indication of how this U.S. Publishing Company document comes up with its numbers (the sole source of his job incidence testimony) or the reliability of those numbers."  (Pl.'s Mem. at 6 (emphasis omitted)).  The defendant responds that Dr. Sachs "utilized reliable statistical sources from U.S. Publishing, as well as his personal knowledge of the labor market and his over twenty-years of experience as an

expert to develop his opinions," and that, "as the ALJ noted in his decision, he was empowered, under 20 C.F.R. § 404.1566 to take administrative notice of the U.S. Publishing data that [Dr.] Sachs relied, in part, upon." (Def.'s Mem. at 18–19).

The substantial evidence standard is both "deferential" and "extremely flexible." *Brault v. Comm'r Soc. Security*, 683 F.3d 443, 449 (2d Cir. 2012). Federal courts have "review[ed] the entirety of a [vocational expert's] testimony, including the expert's methods, to make sure it rose to the level of 'substantial' evidence." *Id.* at 450 (citing *Palmer v. Astrue*, No. 1:10-CV-151 (JGM), 2011 WL 3881024, at *6 (D. Vt. Sept. 2, 2011); *see also Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 406–07 (D. Conn. 2012) (concluding that an ALJ had a sufficient basis to find a vocational expert's testimony reliable, where the vocational expert "utilized reliable statistical sources as well [as] personal knowledge and experience to develop the occupational projections provided," and that "[w]hile the [vocational expert] did not provide a step-by-step description of the methodology used, this Court cannot say that the ALJ erred in accepting the [vocational expert's] testimony as reliable."). The Second Circuit has explained that substantial evidence supports a vocational expert's testimony where the vocational expert has "identified the sources he generally consulted to determine such figures," and that there is a "marked absence of any applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation." *Brault*, 683 F.3d at 450 (citing *Galliotti v. Astrue*, 266 F. App'x 66 (2d Cir. 2008) (summary order) (internal quotation marks omitted)); *see Smith v. Berryhill*, No. 3:17-CV-2080 (KAD), 2019 WL 121781, at *3 (D. Conn. Jan. 7, 2019). "While the rules of evidence are not applicable in administrative proceedings, the ALJ needs some evidentiary basis to rely upon the opinions of the vocational expert." *Ali v. Astrue*, No. 09-CV-166 (RJA)(HBS), 2010 WL 502779, at *5 (W.D.N.Y. Feb. 9, 2010).

Moreover, "[w]hen [the Commissioner] determine[s] that unskilled, sedentary, light, and medium jobs exist in the national economy . . . [she] will take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). The language of section 1566(d) does not "preclud[e] administrative notice of materials that are either published by nongovernmental entities or disseminated by subscription." *Gay v. Sullivan*, 986 F.2d 1336, 1340 (2d Cir. 1993). "[T]he absence of a specific reference to the particular materials involved . . . [does not] undercut their use, as the few publications that are explicitly listed in the regulation are introduced not by language of limitation and exclusion, but by the open-ended phrase, '*for example*, we take notice of — . . . .'" *Id.*

Here, the ALJ properly relied on Dr. Sachs's testimony in reaching his conclusion at step five of the analysis, that jobs exist in significant numbers in the national economy that the plaintiff could perform. First, the U.S. Publishing Company document is a reliable source from which Dr. Sachs obtained the job incidence data to which he testified. In fact, courts have noted that it is appropriate for a vocational expert to consult documents from the U.S. Publishing Company in providing their testimony regarding job availability. *See Brault v. Comm'r Soc. Security*, No. 1:10-CV-112 (JGM), 2011 WL 1135014, at *3–4 (D. Vt. Mar. 24, 2011) (noting that it was permissible for vocational expert to rely on the *Occupational Employment Quarterly II*, a U.S. Publishing Company document, in rendering his testimony); *Lawrence v. Astrue*, 337 F. App'x 579, 586 (7th Cir. 2009) (same); *see also Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014) (noting that vocational experts "normally rely" on the U.S. Publishing document *Occupational Employment Quarterly II*). Additionally, Dr. Sachs's resume reflects over thirty years of vocational testing and counseling to individuals with physical and mental impairments (*See* Tr. 1115–19), as well as over twenty years as a vocational expert with the SSA. (Tr. 1117). His experience, along with the data

found in the U.S. Publishing Company document, provide substantial evidence of the occupational projections about which he testified. This is so even though Dr. Sachs did not provide a step-by-step explanation of his methodology. *See Harper v. Berryhill*, No. 3:16-CV-1168 (SALM), 2017 WL 3085806, at *16 (D. Conn. July 20, 2017). Accordingly, the ALJ properly relied on Dr. Sachs's testimony in reaching his conclusion at step five of the analysis.

## B. THE ALJ PROPERLY APPLIED THE TREATING PHYSICIAN RULE

The plaintiff argues that the ALJ applied the treating physician rule improperly, claiming that "the deference that is to be given to the treating physician's opinions is absent from the ALJ's decision." (Pl.'s Mem. at 26; *see generally* Pl.'s Mem. at 21–28). The defendant responds that "[t]he ALJ's finding that [the] [p]laintiff could perform light work with additional limitations is supported by substantial evidence in the record." (Def.'s Mem. at 2).

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). When the ALJ "do[es] not give the treating source's opinion controlling weight," he must "apply the factors listed" in 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2)

("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

In terms of the his physical functioning, the plaintiff notes that "[t]he ALJ's decision in this matter assigns '[l]ittle weight' to the opinions of Dr. Doris Altherr and APRN Lynne Whitney . . . , the only treating sources who opined." (Pl.'s Mem. at 21 (citation omitted)). The plaintiff has an extensive treatment history with APRN Whitney, his primary care provider, which dates back to February 2012. (*See* Tr. 596–99). The ALJ did not rely significantly on APRN Whitney's opinions, however, reasoning that, "[a]lthough APRN Whitney is a treating source who is an acceptable medical source,[7] the radical variation in opinions and inability to give assessments in some areas (in earlier opinions) despite a lengthy treatment relationship, suggests that she is not quite familiar with the claimant's functioning." (Tr. 839 (footnote added)). The ALJ explained that "the medical records do not show radical improvements and deteriorations that would justify these variations," and that, "[i]n fact, [APRN Whitney] admitted in one opinion that some of the limitations were based on consultation with the claimant." (Tr. 839). The ALJ concluded also that "the record overall fails to support a less-than-sedentary capacity of any kind" and that there were "contrary opinions more consistent with the record" than the treating source opinions. (Tr. 839).

Here, with respect to APRN Whitney, the ALJ did not misapply the treating physician rule. The ALJ noted correctly that, when she was able to provide them, APRN Whitney's assessments

---

7 The ALJ's statement that APRN Whitney is an "acceptable medical source" is not accurate. Although the current version of the Code of Federal Regulations includes "Licensed Advanced Practice Registered Nurse ["APRN"]" in the definition of "[a]cceptable medical source," 20 C.F.R. § 404.1502(a)(7), this version of the Code did not take effect until March 27, 2017. APRN Whitney rendered her opinions about the plaintiff's physical capabilities prior to March 27, 2017 and, thus, did not fall into the Code's definition of "acceptable medical source," *see* 20 C.F.R. § 404.1513(a) (2010). Accordingly, for purposes of this Ruling, the Court does not consider APRN Whitney to be an "acceptable medical source." The Court, however, will address why the ALJ properly afforded "little weight" to APRN Whitney's opinions.

of the plaintiff's condition varied.  For example, in July 2012, APRN Whitney noted that the range of motion in the plaintiff's right shoulder was "limited to chest level," and that the range of motion in his neck was "limited by pain."  (Tr. 601).  In November 2013, APRN Whitney noted that the plaintiff had "full range of motion" in his extremities, and that a musculoskeletal examination revealed "no swelling or deformity." (Tr. 1363).  In the plaintiff's next visit with APRN Whitney, however, she noted that the range of motion in his extremities was "limited by pain."  (Tr. 1360).  Moreover, following a general examination in August 2014, APRN Whitney noted that the plaintiff experienced limited range of motion in, *inter alia*, his cervical spine, while also noting that the plaintiff had "full range of motion in his neck."  (Tr. 1354).  In August 2015, she indicated that a musculoskeletal review revealed "no swelling or deformity, normal gait" (Tr. 1335); however, in November 2015, she reported that the plaintiff had "[right] lateral knee tenderness and diffuse swelling."  (Tr. 1333).  In February 2016, APRN Whitney noted that the plaintiff's range of motion in his cervical spine, right shoulder, and right knee was only "slightly limited by pain."  (Tr. 1327).

Additionally, APRN Whitney completed multiple medical source statements, each with varying opinions.  For instance, in December 2012, APRN Whitney completed a medical source statement in which she noted that the plaintiff "has significant shoulder and knee pain from long history [of] osteoarthritis and Hepatitis C."  (Tr. 1314).  APRN Whitney, however, indicated that she was "unable to estimate" the plaintiff's abilities for each part of the "Physical Capacities Evaluations"[8] and the "Mental Residual Functional Capacity Assessment."  (Tr. 1315–17).  She

[8] Although APRN Whitney was "unable to estimate" the plaintiff's abilities for the activities listed in the "Physical Capacities Evaluations," she indicated that he did not need a cane or assistive device to complete those activities.  (Tr. 1317).

opined that the plaintiff's osteoarthritis, depression, and Hepatitis C prevented him from working and that he would be unable to work for six months of more. (Tr. 1314).

In a May 2013 medical source statement, APRN Whitney noted that the range of motion in the plaintiff's right "arm/shoulder" was limited by pain, and that his impairments were expected to last more than twelve months. (Tr. 1291). She indicated that the plaintiff could "stand/walk" and sit each for eight hours "total in an 8-hour working day (with normal breaks)," and that the plaintiff did not "need a job that permits shifting positions *at will* from sitting, standing, or walking." (Tr. 1292). APRN Whitney again simply wrote "not assessed" next to the following questions: "How many pounds can your patient lift and carry in a competitive work situation [and how often]?"; How often can your patient twist, stoop (bend), crouch/squat, climb ladders, and climb stairs; and "Does your patient have any significant limitations with reaching, handling, or fingering?" (Tr. 1292). APRN Whitney noted also that the plaintiff's "experience of pain or other symptoms" would "rarely" be "severe enough to interfere with attention and concentration needed to perform even simple work tasks." (Tr. 1293). APRN Whitney opined further that "moderate" work stress was "okay," as the plaintiff had "not shown intolerance to stress." (Tr. 1293). When APRN Whitney was asked to "estimate, on average, how many days per month [the plaintiff was] likely to be absent from work as a result of impairments or treatment," she wrote "unknown" and did not answer any of the options provided. (Tr. 1293).

APRN Whitney completed another medical source statement in June 2013. In this report, she noted that the plaintiff suffered from arthritis, with pain in his neck, shoulder, and knees. (Tr. 1307). Under "Objective Findings," she noted that the plaintiff experienced decreased strength and decreased range of motion; under "Supportive Test Results," she noted that an x-ray from July 23, 2012 "show[ed] degenerative changes." (Tr. 1307). APRN Whitney indicated also that the

plaintiff could never walk, could stand for one hour, and could sit for two hours during an eight-hour workday with normal breaks.  (Tr. 1307).  She opined that the plaintiff could never lift or carry more than five pounds, that he could "[f]requently (34-66% of time on job)" lift up to five pounds, and that he could "[o]ccasionally (1-33% of time on job)" carry up to five pounds.  (Tr. 1308).  APRN Whitney noted that the plaintiff could use his hands and feet for repetitive action and that he could occasionally reach; however, she indicated that he could never bend, squat, crawl, or climb.  (Tr. 1308).  APRN Whitney recorded that the plaintiff could never be exposed to unprotected heights, moving machinery, marked changes in temperature and humidity, or dust and fumes, but that he could occasionally drive.  (Tr. 1309).  Although she wrote "N/A" next to the section titled "Mental Status Information," she indicated that it was "unknown" whether the plaintiff had "mental health or substance abuse issues that impact[ed] his . . . ability to work."  (Tr. 1309).  In this report, APRN Whitney noted that the information was "based on discussion with patient, and not by functional capacity exam."  (Tr. 1308).

APRN Whitney's final medical source statement was completed in February 2014.  On this report, she provided that the plaintiff suffers from "degenerative arthritis," that "generalized osteoarthritis" prevented the plaintiff from working, that his condition was expected to last "6 months or more," and that it would be "at least 6 months" before the plaintiff was able to return to work.  (Tr. 1296).  She explained that, over the past year, the plaintiff had experienced "increased pain, stiffness, [and] weakness" (Tr. 1298); however, she opined that the plaintiff could stand and walk each for one hour, and sit for three hours, during the course of an eight-hour workday with normal breaks.  (Tr. 1299).  The report indicated also that the plaintiff could never be around unprotected heights; however, he could occasionally be exposed to marked changes in temperature and humidity, occasionally be around moving machinery, occasionally drive, and occasionally be

exposed to dust and fumes. (Tr. 1300). She noted that the plaintiff could frequently lift up to five pounds and occasionally lift six to ten pounds, but that he could never lift more than ten pounds; he could occasionally carry up to ten pounds, but never carry more than ten pounds. (Tr. 1301). She indicated that the plaintiff could not use either hand for repetitive action such as "push and pull arm controls," and that he could never use his feet "repetitively for pushing and pulling leg controls." (Tr. 1301). APRN Whitney opined that the plaintiff could occasionally bend, but that he could never squat, crawl, climb, or reach. (Tr. 1301).

In addition, APRN Whitney's varying opinions were not consistent with the other objective evidence in the record. For instance, an x-ray of the plaintiff's shoulders taken in February 2012 revealed no abnormalities (Tr. 105), and x-rays of the plaintiff's right knee taken in April 2012 showed "minimal patellofemoral compartment degenerative arthrosis. Small knee effusion. Chondrocalcinosis." (Tr. 517, 1463). In September 2012, Dr. Richard Bryan noted, following a musculoskeletal examination, that the plaintiff had "good passive range of motion of all joints." (Tr. 778). Moreover, records from the Hospital of Central Connecticut from March 2013 reveal that the plaintiff had full range of motion in his neck, back, and joints. (Tr. 1479). Knee x-rays that the plaintiff had taken in May 2013 did not show any significant changes from prior studies. (Tr. 97, 1153–54). A physical therapy note from September 2014 indicated that the plaintiff experienced an improvement in active range of motion, increased strength, and decreased pain. (Tr. 1137). Lastly, following a functional capacity evaluation in March 2015, the physical therapist opined that the plaintiff "should be capable of assuming a position in the light strength category with restrictions . . . ." (Tr. 1595). The physical therapist opined that the plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and constantly lift five pounds (Tr. 1595); she opined further that the plaintiff could occasionally carry ten pounds, frequently carry

five pounds, and constantly carry two pounds. (Tr. 1595). Accordingly, APRN Whitney's opinions were inconsistent with each other and with the other evidence in the record and, therefore, the ALJ properly afforded them only "little weight."

C. THE ALJ PROPERLY DEVELOPED THE RECORD

The plaintiff argues that the ALJ failed to develop the record properly, as "the ALJ found that depression and post-traumatic stress disorder are among [the plaintiff's] severe impairments"; however, "[n]o physician or clinician treating [the plaintiff] for his mental impairments has opined in any way as to the function-by-function impact [that] these 'severe impairments' have on [the plaintiff]." (Pl.'s Mem. at 28). The defendant responds that "the record was more than adequate for the ALJ to determine the function-by-function impact of the plaintiff's mental impairments, and further development of the record was unnecessary." (Def.'s Mem. at 11).

"It is the rule in our circuit that the ALJ, unlike the judge in a trial, must himself affirmatively develop the record." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1997) (internal quotation marks omitted); *see Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018) ("An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." (internal quotation marks omitted)). "Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Moreau*, 2018 WL 1316197, at *4. "Even if the ALJ's decision might otherwise be supported by substantial evidence, the Court cannot reach this conclusion where the decision was based on an incomplete record." *Id.* (internal quotation marks omitted).

"[E]xpert opinions of a treating physician are of particular importance to a disability determination." *Id.* at *5. "What is valuable about the perspective of the treating physician and what distinguishes this evidence from the examining physician and from the ALJ is [the treating

physician's] opportunity to develop an informed opinion as to the physical status of the patient." *Hallet v. Astrue*, No. 3:11-CV-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (citing *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)).  However, "the Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Moreau*, 2018 WL 1316197, at *7 (internal quotation marks omitted).  In *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33–34 (2d Cir. 2013), the Second Circuit stated that, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Id.*; *but see Hallet*, 2012 WL 4371241 ("Where the ALJ fails to fulfill the duty to develop the record, the reviewing district court should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence." (citing *Rivera v. Barnhart*, 379 F. Supp. 2d 599, 608–609 (S.D.N.Y. 2005)).

Here, the ALJ adequately developed the record, as the record contained sufficient evidence from which the ALJ could assess the plaintiff's mental RFC.  For instance, in the plaintiff's records from the Wheeler Clinic, his clinicians noted several times that he presented in a "good" mood, was cooperative, and was able to "control impulses."  (Tr. 791, 794, 809, 813, 1408, 1428, 1435; *see also* Tr. 797, 817, 1430).  The plaintiff's records from the Wheeler Clinic reveal also that, although there were occurrences when the plaintiff felt that his depression symptoms were getting severe, the plaintiff sought treatment and attended both individual and group counseling sessions.[9] (Tr. 1404–07, 1410–12, 1415, 1421, 1424, 1430, 1435, 1437–48, 1449–51).  The record shows

---

[9] The plaintiff, however, was discharged from the Wheeler Clinic on multiple occasions for failure to comply with the attendance policy.  (*See* Tr. 28, 814–16, 821–22, 1407, 1413, 1419, 1422–23, 1425–26, 1451).

also that the plaintiff's depression was at least partially related to his lack of employment (*See* Tr. 791), and that the plaintiff reported that "his mood ha[d] lifted and self-esteem [was] better" after he had worked for a couple of weeks in 2015.[10]  (Tr. 1430).  The record shows that, for the most part, the plaintiff had at least "fair" judgment and insight, and that he formed "logical" thoughts.  (Tr. 791, 794, 807, 809, 813, 1408, 1647, 1654; *see also* Tr. 1415, 1428, 1435).

Moreover, clinicians at the Wheeler Clinic completed "Daily Living Activities" forms, on which they noted their assessment of how the plaintiff performed twenty activities of daily living over the past thirty days.  (Tr. 1458–59, 1649–50).  On the first "Daily Living Activities Form,"[11] dated March 7, 2016, the clinician rated the plaintiff at a six out of seven[12] in the following areas: "Health Practices"; "Leisure"; "Coping Skills"; "Personal Hygiene"; "Grooming"; and "Dress." (Tr. 1458–59).  The plaintiff was rated at a five out of seven[13] in the following areas: "Housing Stability/Maintenance"; "Communication"; "Safety"; "Nutrition"; "Problem Solving"; "Family Relationships"; "[Avoiding] Alcohol/Drug Use"; "Community Resources"; "Social Network"; "Sexuality"; and "Behavior Norms."  (Tr. 1458–59).  The clinician rated the plaintiff at four out of ten[14] in the following areas: "Managing Time"; "Managing Money"; and "Productivity."  (Tr. 1458–59).

---

[10] Although the plaintiff worked, this was not substantial gainful employment.

[11] The second "Daily Living Activities" form was completed on February 27, 2017, after the plaintiff's date last insured.

[12] A rating of six out of seven indicates that the plaintiff performed or managed the activity "[m]ost of the time; very mild impairment or problems in functioning; low level of intermittent paid supports needed."  (Tr. 1458, 1649).  A rating of six out of seven is considered to be "within normal limits."  (*See* Tr. 1458, 1649).

[13] A rating of five out of seven indicates that the plaintiff performed or managed the activity "[a] good bit of the time; mild impairment or problems in functioning; moderate level of intermittent paid supports needed."  (Tr. 1458, 1649).  A rating of five out of ten is considered to be "within normal limits."  (*See* Tr. 1458, 1649).

[14] A rating of four out of ten indicates that the plaintiff performed or managed the activity "[s]ome of the time; moderate impairment or problems in functioning; low level of continuous paid supports needed."  (Tr. 1458, 1649).  A rating of four out of ten is not considered to be "within normal limits."  (Tr. 1458, 1649).

Additionally, Peter A. Weiss, Ph.D., evaluated the plaintiff and completed a "Mental Status Examination." (Tr. 799–804). Dr. Weiss indicated that the plaintiff "reported feeling depressed" and that "his mood [was] frequently sad." (Tr. 801). Dr. Weiss stated also that the plaintiff reported poor sleep "and that his appetite [was] reduced." (Tr. 801). Dr. Weiss noted that the plaintiff had low energy levels, had "lost interest in activities that he used to enjoy," and reported "that he experiences thoughts of suicide, but . . . denied suicidal/homicidal ideation, intent, or plan." (Tr. 801). Dr. Weiss made the following conclusions about the plaintiff in the section titled "Sensorium and Mental Capacity": his "[r]ecent memory was less than adequate"; his "[i]nformation was less than adequate"; his "[c]alculation was adequate"; his "[a]bstract thinking was less than adequate"; his "[s]imilarities and differences were less than adequate"; his "[j]udgment was adequate"; his "[a]ttention and concentration were less than adequate"; and his "[i]nsight appeared good." (Tr. 802). In the section titled "Medical Source Statement," Dr. Weiss opined that the plaintiff's "Major Depressive Disorder would cause significant difficulty with completing work quickly and efficiently, and with focusing appropriately on work tasks. His depressed mood may be severe enough to cause problems with work attendance." (Tr. 803).

Robert DeCarli, PsyD, a State agency psychological consultant, evaluated the plaintiff and issued a report dated March 12, 2013. (Tr. 234–49). In his report, Dr. DeCarli opined that the plaintiff had "understanding and memory limitations"; however, he concluded that the plaintiff was "[n]ot significantly limited" in his "ability to remember locations and work-like procedures" and his "ability to understand and remember very short and simple instructions." (Tr. 246). He opined further that the plaintiff "could have occasional problems (less than 1/3 of the time) with remembering complex directions." (Tr. 246). Dr. DeCarli found also that the plaintiff had "sustained concentration and persistence limitations." (Tr. 246). He concluded that the plaintiff

was "not significantly limited in the following areas: "[t]he ability to carry our very short and simple instructions"; "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "[t]he ability to sustain an ordinary routine without special supervision"; and "[t]he ability to make simple work-related decisions." (Tr. 246–47). He concluded that the plaintiff was "moderately limited" in the following areas: "[t]he ability to carry out detailed instructions"; "[t]he ability to maintain concentration and attention for extended periods"; and "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 246–47). Dr. DeCarli found also that the plaintiff did not suffer from either "social interaction limitations" or "adaption limitations." (Tr. 247).

Based on the evidence discussed above and a thorough review of the record, the Court concludes that sufficient evidence existed in the record from which the ALJ could assess the "function-by-function" impact that the plaintiff's mental impairments had on his RFC. The evidence in the record indicates that the plaintiff was capable of making simple, work-related decisions, that he could use his judgment, and that he could perform simple, routine work. The evidence establishes that the plaintiff was capable of interacting and maintaining relationships with others, as he actively participated in narcotics anonymous meetings and events and had a girlfriend for approximately twenty-five years. The ALJ's mental RFC accounts for the function-by-function impact of the plaintiff's mental impairments, as it limits the plaintiff to "simple, routine tasks," using his judgment "limited to simple, work-related decisions," and dealing with "routine changes in the work setting." (Tr. 838). Adequate evidence existed in the record for the ALJ to determine the plaintiff's mental RFC; accordingly, the ALJ developed the record properly.

D.    THE ALJ PROPERLY EVALUATED THE PLAINTIFF'S PAIN

The plaintiff argues that, "[t]hroughout the course of the medical record and [the plaintiff's] testimony, he has consistently voiced claims of pain, particularly in the neck, right shoulder, and right knee. Yet, [the plaintiff's] pain appears to have been discounted to insignificance by the ALJ." (Pl.'s Mem. at 36). The defendant responds that, though "the ALJ must consider [the] [p]laintiff's subjective reports of pain and other limitations . . . ., an ALJ is not required to accept the subjective complaints without question." (Def.'s Mem. at 11–12).

The Second Circuit has stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . , but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citations omitted); *see Watson v. Berryhill*, 732 F. App'x 48, 51–52 (2d Cir. 2018) (summary order); 20 C.F.R. § 404.1529; Social Security Ruling 96–7p, 1996 WL 374186, at *2–3 (S.S.A. July 2, 1996). The regulations provide the following two-step process for an ALJ to apply when assessing a claimant's subjective complaints of pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . That requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. . . . The ALJ must consider [s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings.

*Genier*, 606 F.3d at 49 (emphasis original; citations and internal quotations marks omitted). The ALJ applied the two-step evaluation process and found that, after "careful consideration of the evidence," the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 838).

The ALJ concluded correctly that the plaintiff's subjective complaints of pain and other limitations were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 838). For example, at the remand hearing, the plaintiff testified that he used a cane since approximately 2015 and could walk only short distances without it. (Tr. 869–70). However, the record does not reflect that the plaintiff used a cane in November 2015, and although he was noted to be using a cane in February 2016, the record indicates that he was not using a cane in April 2016. (*See* Tr. 1322–25, 1327, 1331–33, 1334–35). The plaintiff testified also that his knee frequently "gives out" causing him to trip and sometimes fall. (Tr. 869–70, 886). In September 2012, though, the plaintiff reported to Dr. Richard Bryan that he had "[s]ome difficulty doing stairs because of the knees though no giving out or locking up." (Tr. 777). Moreover, the plaintiff testified that he cleaned and cared for his elderly mother. (Tr. 877). The plaintiff reported also that he tried to go outside everyday (Tr. 420), that each morning he took his dogs outside (Tr. 800), and that he occasionally took walks during the day. (Tr. 800). The plaintiff was able to drive and ride in a car (Tr. 420) and had traveled to Florida on vacation. (*See* Tr. 1392). On an activities of daily living form, the plaintiff reported that his pain affected his ability to, *inter alia*, lift, squat, bend, stand, reach, walk, kneel, and climb stairs; however, he did not check-off the option that his pain affected his ability to sit. (Tr. 422). Furthermore, as noted above, the numerous x-rays and

MRIs that the plaintiff underwent did not reveal any significant abnormalities in his cervical spine, shoulders, or knees. (*See* Tr. 97, 105, 517, 1153–54, 1463). The evidence in the record was, at times, inconsistent with the plaintiff's subjective complaints of pain and other limitations and, accordingly, the ALJ's exercise of discretion in weighing the plaintiff's subjective complaints against the other evidence in the record was proper.

VI.     <u>CONCLUSION</u>

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 29) is DENIED, and the defendant's Motion to Affirm (Doc. No. 30) is GRANTED.

Dated this 7th day of March, 2019 at New Haven, Connecticut.

<u>/s/ Robert M. Spector, USMJ</u>
Robert M. Spector
United States Magistrate Judge